Tigran CHOLAKYAN, individually and behalf of all others similarly situated, Plaintiff,

v.

MERCEDES–BENZ USA, LLC, Defendant.

No. CV 10–05944 MMM (JCx).

United States District Court, C.D. California.

March 28, 2012.

Dara Tabesh, Erotech Law Group PC, San Francisco, CA, David A. Mazie, Eric D. Katz, Matthew Mendelsohn, Mazie Slater Katz & Freeman LLC, Roseland, NJ, Gene F. Williams, Initiative Legal Group APC, Payam Shahian, Strategic Legal Practices APC, Los Angeles, CA, Robert L. Starr, Law Office of Robert L. Starr, Woodland Hills, CA, for Plaintiff.

Troy M. Yoshino, Billie D. Salinas, Eric J. Knapp, Matthew J. Kemner, Carroll Burdick & McDonough LLP, San Francisco, CA, Matthew Thomas Heartney, Arnold & Porter LLP, Los Angeles, CA, for Defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

MARGARET M. MORROW, District Judge.

On August 10, 2010, plaintiff Tigran Cholakyan filed this putative class action against Mercedes–Benz, USA, LLC ("MBUSA") alleging (1) violation of California's Consumer Legal Remedies Act (CLRA), California Civil Code § 1750 et seq.; (2) violation of California's Secret Warranty Law, California Civil Code § 1795.90 et seq.; (3) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 et seq.; and (4) breach of implied warranty under the Song–Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1 et seq.[1] On December 13, 2010, defendant filed a motion to dismiss and/or strike, which the court granted in part and denied in part on June 30, 2011.[2] On July 20, 2011, plaintiffs filed a second amended class action complaint.[3]

Prior to that time, on June 20, 2011, plaintiff had filed a motion for class certification under Rule 23(a) and 23(b)(3).[4] Although he filed the motion to comply with the court's case management schedule, plaintiff requested that the court extend the schedule to give the parties time to resolve various discovery disputes that had allegedly prevented him from obtaining evidence supporting certification.[5] Based on plaintiff's showing, the court extended the date for filing a motion for class certification to January 23, 2012.[6]

On that date, plaintiff filed a new motion for class certification. In contrast to plaintiff's original motion, the pending motion seeks to certify a class under Rule 23(b)(2).[7] Defendant opposes the motion.[8]

## I. FACTUAL BACKGROUND

### A. The Complaint's Allegations

Plaintiff Tigran Cholakyan is a California citizen who resides in Los Angeles County.[9] On August 7, 2008, Cholakyan purchased a Certified Pre–Owned 2005 E–320 Mercedes Benz, with approximately 28,841 miles on its odometer, from Mercedes–Benz of Calaba-

---

1. Complaint, Docket No. 1 (Aug. 10, 2010) at 1.

2. Motion to Dismiss Case for Lack of Standing and Failure to State a Claim and to Strike Class Allegations ("Motion"), Docket No. 11 (Dec. 13, 2010); Order Granting in Part and Denying in Part Motion to Dismiss Case ("First MTD Order"), Docket No. 70 (June 30, 2011).

3. Second Amended Class Action Complaint ("SAC"), Docket No. 86 (July 20, 2011).

4. Motion for Class Certification ("Original Motion"), Docket No. 46 (June 20, 2011).

5. *Ex Parte* Application to Reschedule, Docket No. 39 (June 2, 2011).

6. Order Denying Plaintiff's *Ex Parte* Application to Extend Case Management Schedule, Docket No. 147 (Jan. 6, 2012). The court had already granted plaintiff an extension to January 9, 2012, but concluded that discovery disputes warranted a brief continuance. (*Id.* at 6.)

7. Notice of Manual Filing, Docket No. 151 (Jan. 23, 2012); Motion for Class Certification ("Motion"), Docket No. 174 (Feb. 3, 2012). See also Reply in Support of Plaintiff's Motion for Class Certification ("Reply"), Docket No. 201 (Feb. 21, 2012).

8. MBUSA's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Class Certification ("Opp."), Docket No. 187 (Feb. 13, 2012).

9. Complaint, ¶ 15.

sas, California.[10] In January 2010, he parked the vehicle at Burbank Airport before leaving for a weekend trip to Las Vegas.[11] Upon his return, Cholakyan discovered that it had rained in Los Angeles, and that water had entered and flooded the interior cabin of his vehicle. Subsequently, in March 2010, the interior cabin of plaintiff's vehicle flooded again; there were approximately 44,226 miles on the odometer at the time of this second incident.[12]

Following the March 2010 incident, Cholakyan brought the vehicle to a Mercedes–Benz authorized dealer, and complained about the water leak and the damage it had caused.[13] He asserts that the dealer "verified" that the vehicle was experiencing a "water leak defect,"[14] and advised Cholakyan that he would have to pay several hundred dollars, in addition to a diagnostic fee, to repair the water leak defect and resulting damage.[15] The cost of repairs was not covered by the Certified Pre–Owned vehicle warranty on the vehicle.[16] Cholakyan alleges that the dealer "failed to inform [him] about one of the many causes of the water leak defect," and stated that the water drainage system was blocked with "'leaves and debr[is].'"[17]

Thereafter, water leaked into the overhead dome light located next to the sunroof on Cholakyan's vehicle.[18] After noting this, Cholakyan looked at the vehicle's head liner to see if he could identify any other problems.[19] He noticed that water was leaking into the light that illuminates the front passenger side vanity mirror as well.[20]

Cholakyan alleges that "over the last approximately seven months," his vehicle has experienced "unusual electrical problems."[21] These include failure to make a sound when the doors are locked and unlocked or when the alarm is activated, a malfunction in the sensor that indicates whether the front passenger has fastened his or her seatbelt (which, Cholakyan alleges on information and belief, also tells the vehicle if the passenger side airbag should deploy during an accident), and problems with the vehicle's navigation system.[22] These electrical problems allegedly coincided with multiple water leaks in the vehicle.[23]

Cholakyan seeks to represent a class of similarly situated persons who purchased or leased certain "defective Mercedes–Benz E–Class vehicles sold by defendant," specifically 2003 to 2009 Mercedes–Benz E–Class W–211 vehicles ("class vehicles").[24] He alleges that the class vehicles' water drainage system is defective because it fails to prevent water from entering the vehicles' interior cabins.[25] Cholakyan asserts that the defect is "substantially and unreasonably dangerous" because the water leaks and water damage cause the vehicles to experience electrical failures.[26] He asserts that, in light "of the

10. *Id.*

11. *Id.,* ¶ 17.

12. *Id.,* ¶ 18.

13. *Id.,* ¶ 20.

14. Plaintiff uses the term "water leak defect" to refer to "numerous distinct and serious latent design and/or manufacturing defects" that cause the class vehicles "to be highly prone to water leaks and flooding ... including but not limited to defects in the water drainage system." (*Id.,* ¶ 3.)

15. *Id.,* ¶¶ 18–19.

16. *Id.,* ¶ 19.

17. *Id.,* ¶¶ 20–21. Cholakyan alleges that the parties jointly inspected Cholakyan's vehicle during discovery. The inspection purportedly confirmed that the water drains in plaintiff's vehicle were clogged with leaves and debris. He alleges

on information and belief that other drains of his vehicle's water manage[ment] system are also clogged. (*Id.,* ¶ 24.)

18. *Id.,* ¶ 22.

19. *Id.*

20. *Id.*

21. *Id.,* ¶ 23.

22. *Id.*

23. *Id.*

24. *Id.,* ¶¶ 1, 91.

25. *Id.,* ¶ 36.

26. *Id.* Cholakyan also asserts that the water leak defect is dangerous in a "relatively closed envi-

danger of catastrophic engine and/or electrical system failure as a result of water entering and flooding a vehicle's interior cabin while the vehicle is in operation," the class vehicles pose a safety hazard and are unreasonably dangerous to consumers. Specifically, Cholakyan contends that "the water leak defect can cause engine failure, suddenly and unexpectedly, at any time and under any driving condition or speed, thereby contributing to traffic accidents, which can result in personal injury or death." [27]

In addition to these safety hazards, Cholakyan asserts that the cost of repairing the water leak defect is exorbitant, since consumers are "required to pay hundreds, if not thousands, of dollars both to diagnose and repair the water leak defect and to repair the extensive damage that it causes to a vehicle's electrical system, computer system, and other" parts of the vehicle.[28] As a result, he alleges, on information and belief, that the Class Vehicles are not fit for their intended purpose of providing consumers with safe and reliable transportation.[29]

Cholakyan contends that defendant actively concealed the water leak defect from him and other putative class members at the time they purchased or leased their vehicles, and at all times thereafter. He asserts that defendant "acknowledged" the defect as early as October 22, 2002, when it published a Dealer Technical Bulletin ("DTB") stating that the class vehicles were experiencing "water ingress into the front footwells ... resulting in electrical malfunctions." [30] He asserts that

between 2003 and 2007, defendant undertook at least three "clandestine service campaigns" to address the water leak defects.[31] In March 2004, defendant issued a bulletin noting that "[i]n certain vehicles, it is possible that the water drains located in the front wheelhouses ... may not drain water properly." [32] An October 2004 bulletin stated that "[Mercedes–Benz] ha[d] determined that on affected vehicles ... it is possible that the water drains ... located in the front wheelhouses may not drain water properly." In January 2007, defendant issued yet another bulletin reporting that "on affected vehicles ... the water drains located in the front wheel housings may not drain properly." [33] It directed that dealers "remove the water drain nozzles, if present, and clear the water drain passages." [34] Cholakyan alleges that collectively, the bulletins affected "well over" 100,000 vehicles.[35]

In August 2007, defendant issued another DTB, which revised the 2002 DTB for all "Model 211" vehicles.[36] This DTB was titled "Water Entry Into Fuse Box and/or Front Footwell/Possible Malfunction of Electrical System," and addressed "malfunctions in the electrical system" caused, *inter alia*, by "a blocked drain valve ... causing water to enter the vehicle interior, front SAM and/or fuse box." [37] In February 2008, defendant published yet another DTB, which addressed "water entry in the driver/front passenger foot well and in some cases accompanied with electrical faults due to water in the control units." [38] This DTB identified a number of

---

ronment" because it can promote mold growth. He alleges that the mold can permeate the air inside the vehicle cabin, "thereby exposing Class Members, their passengers, and individuals with whom they come in contact to serious health risks." (*Id.*, ¶ 6 n. 3.) He contends the defect caused a "musty smell" inside his vehicle. (*Id.*)

27. *Id.*, ¶ 37.

28. *Id.*, ¶ 7.

29. *Id.*, ¶ 8.

30. *Id.*, ¶ 39. The 2002 DTB is attached to the complaint as Exhibit 2. The prior complaint referred to these bulletins as Technical Service Bulletins, or "TSBs."

31. *Id.*, ¶ 40.

32. *Id.* This bulletin is attached to the complaint as Exhibit 3.

33. *Id.* This bulletin is attached to the complaint as Exhibit 4.

34. *Id.* This bulletin is attached to the complaint as Exhibit 5.

35. *Id.*

36. *Id.*, ¶ 41.

37. *Id.* This DTB is attached to the complaint as Exhibit 6.

38. *Id.*, ¶ 42. This DTB is attached to the complaint as Exhibit 7.

potential causes for the water entry, including:

"(1) 'Blocked water drain in the upper longitudinal member under the front fender (blocked by debris);' (2) 'Rising water penetrates the interior compartment because of a lack of seam sealer on the double panel of the firewall/longitudinal member on the inside at the top;' or (3) 'Mounting hole for the tilting/sliding roof drain hose, water may back up and over flow into interior.'..." [39]

The DTB proposed three fixes for the problem. The first two directed dealers to "(1) 'Clean the areas of the upper longitudinal member under the front fender,' [and] (2) 'Apply seam sealing to the double panel of the firewall/longitudinal member toward the cross member under the wind deflector....'" [40] The DTB also suggested that "[t]o permanently fix the water drain problem mentioned in possible cause 1," the dealer should create "a water drain hole with reinforcement plate...." [41]

Cholakyan's complaint contains a number of allegations regarding defendant's warranty policy. He contends that Mercedes–Benz has a "blanket policy" of not covering water leaks or the damage they cause under any of its express, certified pre-owned, or other warranties.[42] Defendant purportedly has

this policy because it attributes water leaks to "outside influences" or class members' negligence.[43] Cholakyan asserts that, after issuing the 2008 DTB, defendant instituted "a blanket policy of secretly paying for the cost of clearing or cleaning any of the clogged drains that [ ]are part of the water drainage system ... even when the clogging of these drains occurred outside of the vehicle's 4–year/50,000–mile express warranty—as long as ... consumers complained about the clogged drains directly to MBUSA's headquarters and/or through its dealers." [44] Defendant effected this "extension" of express warranty protection despite its general policy of not covering water leak damage under other warranties.[45]

In addition to the fixes mentioned earlier, the 2008 DTB suggests certain modifications to the class vehicles' water drainage systems.[46] Defendants allegedly did not notify class members whose vehicles were manufactured prior to the 2008 DTB that such modifications should be made; nor did it advise consumers who contacted its headquarters before the DTB issued of the modifications.[47] Cholakyan maintains that defendant made a decision to offer free, "clandestine" repairs under a "systematic policy" designed to cover non-warranty repairs, and to pacify angry

---

**39.** *Id.*

**40.** *Id.*

**41.** *Id.*

**42.** *Id.*, ¶ 49.

**43.** *Id.*

**44.** *Id.*, ¶ 63. The complaint alleges that one class member sent an email to defendant on February 9, 2010, complaining about the water leak defect in his vehicle. (*Id.*, ¶¶ 63–66.) The customer had taken the car to his or her dealer, who stated that "drains which were designed to take water away from the car were plugged," and advised that the drains were not covered by the extended warranty because they were a "trim item." (*Id.*, ¶ 64.) In response, Mercedes–Benz allegedly communicated with the dealer, who eventually "cleaned out the drains." (*Id.*, ¶ 67.)

Cholakyan contends that a representative of defendant admitted at deposition that "thousands of water leak complaints" were received by its customer complaint line during the class period.

(*Id.*, ¶ 68.) Defendant purportedly offered to pay the cost of cleaning and clearing the water management drains only for customers who complained after the 2008 DTB was issued. (*Id.*) One of defendant's employees allegedly testified that defendant did not implement procedures to assure that every consumer who incurred expenses cleaning and clearing the water drains was reimbursed. (*Id.*)

Cholakyan pleads that covering the cost of water leak-related damage, and offering to add seam sealer and/or additional drain holes to fix the water drain problem, are adjustment programs under California's secret warranty law. (*Id.*, ¶¶ 69–85.)

**45.** *Id.*, ¶ 69.

**46.** *Id.*, ¶ 72. "These modifications require the dealer to 'apply seam sealing to the double panel of the firewall/longitudinal member' and to add an additional 'water drain hole' in an alleged attempt to 'permanently fix the problem' ('water drainage system modification')." (*Id.*)

**47.** *Id.*, ¶ 74.

customers, in order to conceal the extent and prevalence of the water leak defect.[48]

## B. The Proposed Class and the Relief Sought

Cholakyan seeks to certify a class of "[a]ll California residents who are current or former owners or lessees of Defendant's 2003 through 2009 model year 'Model 211' style vehicles."[49] He asserts class claims alleging violation of the CLRA, the UCL's "unlawful" prong (based on defendant's purported violation of California's Secret Warranty Law), and "other" aspects of the UCL. He also alleges breach of implied warranty under the Song–Beverly Act.[50]

Cholakyan seeks to have the court certify a class under Rule 23(b)(2), and to declare, *inter alia*, that:

- All of the Model 211 vehicles manufactured between 2003 and 2009 ("class vehicles") have a defectively designed "Water Management System";
- Defendant was required to, and did not, give notice of the water leak defect, available remedies, and the adjustment program to owners and lessees of the Model 211 vehicles;
- As a result of the water leak defect, the Model 211 vehicles were not fit for the ordinary purposes for which they were sold when delivered.[51]

Cholakyan also seeks various forms of injunctive relief that would require defendant, *inter alia*, to:

- provide class members with vehicles under warranty the modifications described in the 2007 and 2008 DTBs and Service Campaign Bulletins at no cost;
- implement a program through which current and former Model 211 owners and lessees who paid for repairs to the "Water Management System" may be reimbursed;
- add "Water Management System" maintenance to the regular maintenance schedule for the Model 211 vehicles, and provide owners with notice of the addition;
- implement a new Special Adjustment Program pursuant to which defendant must provide notice of any adjustment program to affected vehicle owners within 90 days;
- include a provision in its warranty manual that covers water leaks resulting from clogged drains, until defendant disseminates notice to the class that water management system maintenance is required as part of regular vehicle maintenance.[52] As noted, Cholakyan no longer seeks to certify a Rule 23(b)(3) class.

## II. DISCUSSION

### A. Evidentiary Objections to the Parties' Respective Expert Reports

#### 1. Legal Standard Governing Admissibility of Expert Reports on Class Certification Motions

Before addressing the merits of the certification motion, the court must consider the parties' exhaustive challenges under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to their opponent's experts. While courts in this circuit have previously concluded that expert testimony is admissible in evaluating class certification without conducting a rigorous *Daubert* analysis, the Supreme Court in *Dukes* expressed "doubt that this is so." *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2554, 180 L.Ed.2d 374 (2011). After *Dukes*, the Ninth Circuit approved the application of *Daubert* to expert testimony presented in support of or opposition to a motion for class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.2011) ("In its analysis of Costco's motions to strike, the district court correctly applied the evidentiary standard set forth in *Daubert* ..."). As a

---

**48.** *Id.*, ¶¶ 78–79.

**49.** Proposed Order.

**50.** *Id.*

**51.** Motion at 22.

**52.** *Id.*

result, the court applies that standard to the expert reports the parties have submitted.[53]

Under Rule 702,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir.2002) ("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D.Cal.2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

■ Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786; see also *Ellis*, 657

---

53. Cholakyan relies heavily on *In re Zurn Pex Plumbing Prods. Liability Litig.*, 644 F.3d 604, 613 (8th Cir.2011), and *Behrend v. Comcast Corp.*, 655 F.3d 182, 204 n. 13 (3d Cir.2011), for the proposition that "a full *Daubert* inquiry is neither required nor appropriate at the class certification stage." (Plaintiff's Response to Defendant's Objections to Declaration of Robert Waters in Support of Class Certification, Docket No. 201 (Feb. 21, 2012) at 2.) *Zurn* and *Behrend*, of course, are out-of-circuit authority not binding on this court, particularly in light of the Ninth Circuit's express approval in *Ellis* of conducting a full *Daubert* analysis at the class certification stage. Given *Dukes* and *Ellis*, the court concludes that applying *Daubert* is appropriate. Indeed, neither *Zurn* nor *Behrend* disapproved of such an inquiry under the circumstances presented here. The *Zurn* court based its reasoning on the notion that "an exhaustive and conclusive *Daubert* inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings." 644 F.3d at 613. In contrast to *Zurn*, discovery in this case is close to conclusion. Despite Cholakyan's claim that he has been "unable to conduct full discovery" due to defendant's "improper scope objection" (Reply at 3 n. 3), he has had substantial time to conduct both certification and merits discovery. Cholakyan's certification motion was originally to have been filed in *June 2011*. The court granted him two extensions so he could complete the discovery necessary to support the motion.

The *Behrend* court, for its part, instructed district courts to "evaluate whether an expert is presenting a model which could evolve to become admissible evidence," rather than "requiring a district court to determine if a model is perfect at the certification stage." 655 F.3d at 204 n. 13. It cautioned, however, that the district court must still "evaluate expert models to determine whether the theory of proof is plausible." *Id.* This type of analysis appears largely to overlap with the *Daubert* inquiry that is most relevant for class certification purposes—i.e., whether the parties can show that their experts' assessment of the efficacy of classwide treatment of the claims is reliable.

Particularly given the Ninth Circuit's direction in *Ellis* that district courts should apply *Daubert* in evaluating class certification motions, *Zurn* and *Behrend* do not mandate a different result. They are instructive in one regard, however. Any determination the court makes regarding the admissibility of expert testimony (other than a finding that an expert is not qualified), is not a final conclusion that will control the admissibility of the expert's testimony *at trial*. "Because a decision to certify a class is far from a conclusive judgment on the merits of the case," *Zurn*, 644 F.3d at 613, any *Daubert* analysis conducted in connection with class certification should be for purposes of that proceeding only. See also *Behrend*, 655 F.3d at 204 n. 13 (observing that "the District Court likely determined that Dr. McClave's model could be refined between the time when class certification was granted and trial so as to comply with *Daubert*."); cf. *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 629 (W.D.Wash.2011) ("This court believes that *Zurn* has struck the right balance. It honors the Supreme Court's dictum in *Dukes* by applying *Daubert* at class certification, but it does so in a manner that recognizes the specific criteria under consideration, as well as the differing stage of discovery and state of the evidence, at the class certification stage").

F.3d at 982 ("Under *Daubert,* the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable"). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *United States v. Espinosa,* 827 F.2d 604, 611 (9th Cir.1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

■ "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.,* No. CV 02–2258 JM (AJB), 2007 WL 935703, *4 (S.D.Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999) (in turn citing *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786)); see also *Walker v. Contra Costa County,* No. C 03–3723 TEH, 2006 WL 3371438, *1 (N.D.Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States,* 483 U.S. 171, 172, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), and *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir. 1994)).[54]

■ "In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.,* 155 F.3d 1130, 1134 (9th Cir.1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.,* 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is applied consistent with

the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)). On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant in assessing "whether there was a common pattern and practice that could affect the class as a whole." *Ellis,* 657 F.3d at 983.

### 2. Plaintiffs' Expert: Robert J. Waters

Waters is the principal consultant and owner of Waters Consulting, LLC.[55] He has been a professional automotive technician for over thirty years. He began his formal training in the field as a mechanic at Ford Motor Company; he attained the title of master technician in 1996.[56] For the last ten years of his thirty year career, Waters has worked as a shop foreman.[57] The National Institute for Automotive Service Excellence has qualified him as a certified master automotive technician. He is also a member of the Society of Automotive Engineers.[58]

■ Defendant raises a series of objections to Waters' testimony,[59] some of which go less to the reliability of Waters's opinions than to defendant's disagreement with his conclusions and attack on his credibility as a witness.[60] These types of objections are not relevant to the Rule 702 analysis. See *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1230–31 (9th Cir.1998) ("In arriving at a conclusion, the factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony. But their presence should not

---

54. This showing must be by a preponderance of the evidence. See *Daubert,* 509 U.S. at 594 n. 10, 113 S.Ct. 2786 (citing *Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. 2775).

55. Declaration of Robert J. Waters in Support of Plaintiff's Motion for Class Certification ("Waters Decl."), Docket No. 175 (Feb. 3, 2012); Supplemental Declaration of Robert Waters in Support of Plaintiff's Motion for Class Certification ("Supplemental Waters Decl."), Docket No. 201 (Feb. 21, 2012).

56. *Id.,* ¶ 3.

57. *Id.*

58. *Id.*

59. Objections to Declaration of Robert Waters in Support of Class Certification ("Waters Objection"), Docket No. 188 (Feb. 13, 2012).

60. See, e.g., *id.* at 10–13 (pointing out purported inconsistencies in Waters's testimony).

preclude the admission of the expert's testimony—they go to the weight, not the admissibility"); *McClellan v. I-Flow Corp.,* 710 F.Supp.2d 1092, 1101 (D.Or.2010) ("[E]stablishing reliability should not mean that plaintiffs 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable'," quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 744); see also *United States v. Prime,* 431 F.3d 1147, 1153 (9th Cir.2005) (stating that the proper inquiry focuses " 'solely on principles and methodology, not on the conclusions that they generate,' " quoting *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, and that "[a]s long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts").

Defendant's other objections, however, attack Waters's reliability as an expert. Defendant notes that (1) Waters conducted no vehicle testing himself, and based his opinions largely, if not entirely, on the observations of another expert, Martin Potok, who previously offered testimony in support of plaintiff's claims; (2) Waters offers opinions about all class vehicles based on his examination of a single W–211 automobile, and (3) some of Waters' conclusions are not based on "reliable principles and methods." FED. R.EVID. 702.

Defendant's first objection is the most serious, since it raises the specter that Waters has not independently evaluated the evidence, but is merely parroting the opinions and conclusions of another expert whose testimony is now shielded from cross-examination.[61] *Matter of James Wilson Associates,* 965 F.2d 160, 173 (7th Cir.1992); *id.* at 172–73 ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him—information of which he lacks first-hand knowledge and which might

not be admissible in evidence no matter by whom presented.... [T]he judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence"). An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions. See *Fosmire,* 277 F.R.D. 625 at 629 ("Dr. Polissar's expert report is deficient in several ways. First, although his opinions are based on Dr. Siskin's data and methodology, there is nothing in the record to indicate that Dr. Polissar has tested Dr. Siskin's underlying data to ensure its reliability or that Dr. Polissar even has access to Dr. Siskin's underlying data"); *In re Imperial Credit Indus., Inc. Secs. Litig.,* 252 F.Supp.2d 1005, 1012 (C.D.Cal.2003) ("The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation"); see also *Tokio Marine & Fire Ins. Co., Ltd. v. Norfolk & Western Ry. Co.,* No. 98–1050, 98–1077, 1999 WL 12931, *4 (4th Cir. Jan. 14, 1999) (Unpub. Disp.) ("[O]ne expert may not give the opinion of another expert who does not testify"); *American Key Corp. v. Cole National Corp.,* 762 F.2d 1569, 1580 (11th Cir.1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not").

By contrast, an expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence. See *Jerpe v. Aerospatiale,* No. CIV. S–03–555 LKK/DAD, 2007 WL 1394969, *6 (E.D.Cal. May 10, 2007) (crediting an expert's declaration that he "independently arrived" at his opinions despite "deposition testimony [that] was somewhat ambiguous on the issue of whether [expert] was merely relying on the same underlying data set produced at the direction of [another expert]"); *Gray v. United States,* Civil No. 05cv1893 J(BLM), 2007 WL 4644736, *8 (S.D.Cal. Mar. 17, 2007) ("Ms. Hyland[ ] ... states that she considered all of the input and also considered

---

**61.** Declaration of Troy M. Yoshino in Support of MBUSA's (1) Opposition to Plaintiff's Motion for Class Certification, and Supporting Documents, et al. ("Yoshino Decl."), Docket No. 187 (Feb. 13, 2012), Exh. 3 ("Waters Depo.") at 44:4–7.

information from the San Diego County Medical Society and from a compendium of physician compensation studies. In light of Ms. Hyland's indication that she has interviewed Dr. Gray, reviewed medical records, as well as consulted with search firms, the Court declines to, at this time, take the drastic measure of excluding her report and testimony").

■ Waters testified at his deposition that he had seen only one class vehicle before formulating opinions, namely, Cholakyan's; he said he inspected that car for "three hours."[62] He acknowledged reading Potok's report and had the following colloquy with counsel regarding an expert report he submitted in November 2011:

"Q: *[O]ver 80 percent of this [report] is actually literally taken word for word from the Potok report?*

A: *Why reinvent the wheel?*

Q: Okay. So you just accepted—I mean, you have no disagreements with Mr. Potok then, I take it?

A: Well, that's not—that's not—there were several things in his report that I didn't agree on, and they were removed from my report. And things were add— different things were added.

Q: What did you not agree with in Mr. Potok's report?

A: I don't remember off the top of my head...."[63]

That Waters conducted no independent testing of water leakage in class vehicles casts doubt on the reliability of his opinions, as does the notion that he replicated large portions of Potok's expert opinions and adopted them as his own. Moreover, despite Waters's claims that he "didn't agree" with some of Potok's conclusions, it is troubling that, when pressed, he could not identify a single point of disagreement with Potok.

Defendant contends that Waters's class certification declaration is "almost an exact copy" of his expert report, and that the report is in turn "copied almost word-for-word" from Potok's expert report.[64] The court has not been given copies of the reports and is thus not in a position to ascertain the accuracy of defendant's argument. It does, however, have access to the declaration Potok filed in support of Cholakyan's original class certification motion.[65] A comparison of this declaration and Waters' declaration, filed almost eight months later, reveals that they are not only identical in their reasoning and conclusions, but *identical in the language used to detail the reasoning and conclusions.*[66] In

---

62. *Id.* at 28:2–9, 30:15–31:10. Cholakyan asserts that Waters asked to conduct water testing on the vehicle, but that defendant "vehemently opposed" his request. (Waters Objections Response at 12 n. 8.) He cites no evidence in support of this proposition, however.

63. Waters Depo. at 72:2–15 (emphasis added). The exchange continued as follows:
 "Q: Well, give me your best recollection of what it is that you disagreed with.
 A: I don't remember.
 Q: Well, what is it that you added that—
 A: Oh, I—I don't have the—I started with the—I had notes and all that, but I don't have that with me anymore. So it's like—I don't remember. That's been—[end of sentence]" *Id.* at 72:17–24.

64. Waters Objection at 4.

65. Declaration of Martin Potok in Support of Plaintiff's Motion for Class Certification ("Potok Decl."), Docket No. 47 (June 20, 2011).

66. Compare, e.g., Potok Decl., ¶ 35 ("The above-described Cowl Drainage System is the same on all Class Vehicles. The commonality of the parts

used and configuration of the system is confirmed by MBUSA's own "STARtek Info" website and its "EPC" and "WIS" databases therein.") with Waters Decl., ¶ 24 ("The above-described Cowl Drainage System is the same on all Class Vehicles when they were originally leased or sold.... The commonality of the parts used and configuration of the system is confirmed by MBUSA's own "STARtek Info" website and its "EPC" and "WIS" databases therein."); Potok Decl., ¶ 35 (offering similar comments regarding the "Sunroof Drainage System") with Waters Decl., ¶ 24 (same); Potok Decl., ¶ 44 ("The first defect is that the grate that is over the primary cowl drain contains holes that are too large, which allows organic debris to be washed into the system ("Grate Defect"). When pieces of organic debris are permitted to enter the Cowl Drainage System in the E-class vehicles, it will eventually result in the clogging and failure of the system. As you can see from the side-by-side pictures below, the E–Class vehicle grate openings on the left are larger than the fine mesh grate used on another competitive vehicle") with Waters Decl., ¶ 32 ("The first defect is that the grate that is over the primary cowl drain contains holes that are too large, which allows or-

fact, Waters appears to have cut and paste large parts of Potok's declaration, altered a few key sentences and phrases, and simply adopted Potok's conclusions as his own. Despite Waters' assertion that he relied on documentary evidence and despite his testimony that he exercised independent judgment in reaching his conclusions, it strains credulity to think that his opinions were so exactly coextensive to Potok's that he felt comfortable simply taking an *entire* declaration, copying it almost verbatim, and submitting it as his own.[67]

The court acknowledges that, in contrast to the expert excluded in *James Wilson*, Waters is in a position to assess the validity of Potok's opinions and offer his own view of their validity. See *Matter of James Wilson*, 965 F.2d at 173 (observing that the expert in question was an architect who adopted and vouched for the conclusions of an *engineer*, despite his avowed lack of engineering knowledge). Yet there is no evidence that Waters used Potok's conclusions merely as a sounding board or reference point for making his own assessments. Compare *Wolkowitz v. Lerner*, No. SA CV 07–777–CAS, 2008 WL 1885770, *4 (C.D.Cal. Apr. 21, 2008) (declining to exclude an expert opinion merely because the expert "asked [another] consultant questions to confirm Reiss' own opinions"). Waters identifies a large number of

documents he reviewed in reaching his conclusions, which mitigates somewhat the indications that he adopted Potok's conclusions wholesale.[68] The fact remains, however, that it is Cholakyan's burden to demonstrate by a preponderance of the evidence that Waters' testimony is reliable and should be considered in deciding this motion. The evidence he has adduced does not adequately demonstrate that Waters exercised independent judgment; rather, it strongly suggests he took Potok's conclusions, engaged in little, if any, evaluation of their merits, and reproduced Potok's declaration wholesale (*including its typographical errors*) as his own work. The court cannot rely on such "testimony."

Waters' declaration also incorporates wholesale the results of two investigations conducted at the request of State Farm Insurance Company. The investigations concerned two vehicles that "sustained damage to the vehicle interiors and/or electronic components as a result of water ingress that was caused by defects in the cowl drainage system." [69] Waters cites entire paragraphs of a report prepared by the engineer who conducted this investigation, discussing the effect of water leakage on class vehicles' electrical system.[70] Waters offers no independent analysis or opinion regarding the

ganic debris to be washed into the system ("Grate Defect"). When pieces of organic debris are permitted to enter the Cowl Drainage System in the E-class vehicles, it will eventually result in the clogging and failure of the system. As you can see from the side-by-side pictures below, the E–Class vehicle grate openings on the left are larger than the fine mesh grate used on another competitive vehicle"); Potok Decl., ¶ 48 ("Defendant apparently claims that the space between the sheet metal in the fender cavity and the sunroof drain hose that runs through it is also a 'drain.' Based on my inspection of several E-class Vehicles, there is no way that this space should be considered a 'drain.' While the miniscule gap may allow some water to weep out of the fender cavity, it will not contribute to significant drainage. Additionally, in order for the water in the fender cavity to reach this gap, it must build-up and rise within the fender cavity") with Waters Decl., ¶ 35 ("Defendant apparently claims that the space between the sheet metal in the fender cavity and the sunroof drain hose that runs through it is also a 'drain.' Based on my inspection of Mr. Cholakyan's vehicle and pictures of other W211 vehicles, there is no way that

this space should be considered a 'drain.' While the miniscule gap may allow some water to weep out of the fender cavity, it will not contribute to significant drainage. Additionally, in order for the water in the fender cavity to reach this gap, it must build-up and rise within the fender cavity").

67. Cholakyan may argue that Waters copied much of Potok's declaration to keep time and expenses to a minimum. The court is troubled by the fact that Waters did not attempt at least to reframe Potok's conclusions in his own words. Had he done so, he would have had occasion to to examine each of Potok's assertions, digest it, and determine whether he agreed or disagreed. There is no indication that he engaged in even this form of minimal analysis.

68. Waters Decl., ¶ 5.

69. *Id.*, ¶ 70.

70. *Id.*, ¶ 71. The investigation reports are appended to Waters's declaration as Exhibits H and Y.

validity of the investigative reports. Indeed, his declaration offers virtually no context as to why reference to the reports is included. Once again, the fact that Waters quotes extensively from the reports indicates not that he is using them to confirm the validity of his opinions, but rather that he seeks to serve as a mouthpiece for others. See *Mesfun v. Hagos,* No. CV 03–02182 MMM (RNBx), 2005 WL 5956612, *18 (C.D.Cal. Feb. 16, 2005) (observing that "Rule 703 does not permit an expert witness to circumvent the rules of hearsay by testifying to the opinions of other experts" and collecting cases). It also suggests that Waters has little independent assessment of the relevant issues to offer.

Waters's testimony is suspect for other reasons as well. While he discusses at length the damage Cholakyan's vehicle experienced as a result of the alleged water defects, he bases his conclusions on a single vehicle inspection that did not involve independent testing, photographs and video of prior inspections, and documentary evidence.[71] While questions as to whether an expert has applied a particular methodology correctly typically go the weight of the evidence, Waters's opinions concerning Cholakyan's vehicle are of limited value because it does not appear he applied any methodology. See *Cabrera v. Cordis Corp.,* 134 F.3d 1418, 1423 (9th Cir.1998) (excluding an expert's testimony because he did not "demonstrate that he followed a scientific method em-

braced by at least some other experts in the field"); *Heisler v. Maxtor Corp.,* No. 5:06–cv–06634–JF (PSG), 2011 WL 1496114, *7 (N.D.Cal. Apr. 20, 2011) (identifying a variety of concerns with the reliability of an expert opinion, including "the fact that Plaintiffs offer no evidence that Fowler's approach is an accepted method for analyzing defects such as those at issue here, nor do they offer evidence with respect to the reliability of the tests that Fowler performed"); see also *American Honda Motor Co. v. Allen,* 600 F.3d 813, 818 (7th Cir.2010) ("The methodology underlying the tests Ezra conducted to determine whether the GL1800 met his standard also gives us pause. Ezra tested a single, used 2006 GL1800, ridden by a single test rider, and extrapolated his conclusions to the fleet of GL1800s produced from 2001 to 2008").

While the credibility of "shaky" expert testimony is ordinarily a subject for cross-examination, "the testimony proffered here is not merely shaky: it is unreliable." *Allen,* 600 F.3d at 818. The court, therefore, excludes Waters' declarations in their entirety for purposes of determining whether certification of a class is warranted. It relies on the testimony solely for the limited purpose of ascertaining plaintiff's theory of the alleged defect, since Waters expounds at length on purported defects in the water management system of the class vehicles and Cholakyan briefs rely heavily on Waters' description of them.[72]

---

**71.** Waters Decl., ¶¶ 57–61. Moreover, this part of Waters' declaration once again parrots Potok's declaration. (Compare Potok Decl., ¶ 72 ("[B]ased on my review of Plaintiff's Declaration, service records (including documentation that Plaintiff's drains are clogged with debris), and pictures of Plaintiff's vehicle, I believe that it is likely that the water ingress into the interior footwells of his vehicle was caused by a defects [sic] in the Cowl Drainage System and the water ingress into the overhead control panel, dome light and sun visor areas were caused by the defect in the Sunroof Drainage System") with Waters Decl., ¶ 58 ("I believe that it is likely that the water ingress into the interior footwells of his vehicle was caused by a defects [sic] in the Cowl Drainage System and the water ingress into the overhead control panel, dome light and sun visor areas were caused by the defect in the Sunroof Drainage System")). It is notable that Waters' declaration incorporates the same typographical errors found in Potok's declaration.

**72.** The court observes that even if it were inclined to admit Waters' testimony, it would not change the outcome of this motion. Although the court addresses the parties' evidence in some detail in assessing commonality, for the most part, the court accepts Cholakyan's theory of the case as a given, and notes numerous ways in which commonality is not satisfied under that theory.

Moreover, even if the court were to deem Waters' testimony reliable, and rely on it in conducting the commonality analysis, only one of the three grounds for denying class certification relies in any substantial part on expert testimony. The court notes additionally that, even if it admitted Waters' testimony, it would accord the testimony minimal weight for the reason that Waters has chosen to parrot the testimony of another expert and has offered no evidence that he used independent judgment in reaching the conclusions he offers.

### 3. Defendant's Expert: Edward M. Caulfield

Cholakyan, for his part, seeks to exclude the testimony of defendant's expert, Caufield.[73] Caulfield is the president and chief technical officer of Caulfield Engineering, LLC, a consulting firm.[74] Prior to founding the firm, Caufield was president and chief technical officer of Packer Engineering, Inc., another engineering consulting firm. He has a master's degree and Ph.D. in theoretical and applied mechanics, as well as a bachelor's degree in mechanical engineering, all from the University of Illinois at Urbana–Champaign.[75] He is a registered professional engineer in Illinois and Florida.[76] Caulfield personally inspected more than 19 class vehicles, including Cholakyan's; he reports that he inspected at least one vehicle from each year that class vehicles was produced.[77]

Cholakyan advances several grounds for excluding portions of Caulfield's declaration.[78] Several of the excerpts to which objection is made concern subjects that are immaterial to decision of this motion, e.g., the reasonableness of advising consumers regarding vehicle maintenance,[79] whether a waterproof cover was removed from Cholakyan's vehicle before it was water-tested,[80] and references to Potok's designation as plaintiff's expert.[81] As a result, the court declines to address Cholakyan's objections to these portions. Cholakyan also objects to Caufield's conclusion that his vehicle does not suffer from a water leak defect; although Cholakyan attempts to question the "relevance" of the conclusion, in reality he disagrees with the substance of Caulfield's opinion.[82] As this is not a true evidentiary objection, it is overruled.

The objections that concern the court are whether Caulfield improperly relied on inspections of vehicles that were not made available to Cholakyan, and whether he has

While the court has analyzed the admissibility of Waters's testimony under *Daubert*, it would exclude his expert opinion even under the looser standard advocated by Cholakyan. In *Zurn*, the Eighth Circuit expressed concern that class certification motions are often brought before the close of fact discovery, and that an expert may be able to strengthen his methodology and opinions as additional evidence comes to light. It noted that, before discovery has concluded, "the court's analysis is necessarily prospective and subject to change, and there is bound to be some evidentiary uncertainty." *Zurn*, 644 F.3d at 613. Similarly, the Third Circuit in *Behrend* warned against "requiring a district court to determine if a model is perfect at the certification stage," since the parties' theories of the case could evolve as discovery progressed. *Behrend*, 655 F.3d at 204 n. 13. The court here does not face the problem of an expert who has advanced an imperfect model based on imperfect evidence. Waters has failed to advance *any* "model" for understanding the evidence. Rather, he appears to have adopted wholesale Potok's analysis. Consequently, the reliability of Waters's opinion more fundamentally suspect than the opinions of the experts in *Zurn* or *Behrend*, and exclusion is warranted even under the more "focused" *Daubert* inquiry approved by the Third and Eighth Circuits.

73. Declaration of Edward M. Caulfield in Support of Mercedes–Benz USA, LLC's Opposition to Plaintiff's Motion for Class Certification ("Caulfield Decl."), Docket No. 213 (Feb. 13, 2012).

74. *Id.*, ¶ 2. Caulfield's curriculum vitae is attached to his declaration as Exhibit 1.

75. *Id.*, ¶ 3.

76. *Id.*

77. *Id.*, ¶ 4.

78. Objections to Declaration of Edward M. Caulfield in Support of Defendant's Opposition to Motion for Class Certification ("Caulfield Objections"), Docket No. 204 (Feb. 21, 2012).

79. *Id.* at 7–8.

80. *Id.* at 8–9.

81. *Id.* at 11. As is made clear *infra*, facts concerning the reasonableness of advising consumers about vehicle maintenance and whether a waterproof cover was removed from Cholakyan's vehicle are not necessary to decision of this motion. Moreover, the court does not rely on Caulfield's declaration in assessing whether Potok was ever formally designated Cholakyan's "expert," since this is an issue it need not presently resolve. The court notes, however, that Cholakyan's position regarding Potok is belied by the fact that he submitted Potok's declaration and deposition testimony in support of his original motion for class certification. If Potok was not acting in an expert capacity, the court is hard pressed to understand why Cholakyan relied on his testimony at that time.

82. *Id.* at 9–10.

offered sufficient foundation for his assertion that the "wheelhouse nozzles" are not defective. The first objection is part and parcel of Cholakyan's ongoing discovery disputes with defendant. Cholakyan contends that defendant refused to make certain "exemplar parts" of class vehicles available for inspection, yet gave Caufield entire vehicles for inspection.[83] Cholakyan has raised this issue in a motion for sanctions that is pending before Judge Chooljian,[84] and the court declines to address whether defendant improperly withheld "exemplar parts" from Cholakyan as a result. Absent a finding by Judge Chooljian that defendant should be sanctioned, the court cannot find that large portions of Caufield's declaration should be excluded on the basis of a discovery dispute.

▪ Cholakyan also contends that Caufield has failed to lay a foundation for his conclusion that because "over 98% of putative class vehicles have no nozzles, [ ]any purported defect with wheelhouse nozzles is certainly not [a] classwide [issue]."[85] As the basis for this conclusion, Caufield relies on the declaration of Jason Smith, one of defendant's engineers and a designated expert witness.[86] Smith offers a series of statistics and percentage calculations based in part on his familiarity with the vehicles' design and manufacture and with the service campaigns and DTBs at issue in this case.[87] As an expert witness, Caufield can properly rely on the statements of other witnesses in rendering opinions. FED.R.EVID. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted"). Consequently, this objection is overruled.

▪ In addition to objecting to their opponent's expert declarations, the parties make numerous objections to other evidence. The court sees little utility in addressing each and every objection raised, as many are based on questionable grounds. See *Jimenez v. Domino's Pizza,* 238 F.R.D. 241, 246 n. 1

83. *Id.* at 3–5.

84. *Id.* at 6–7.

85. Caulfield Decl., ¶ 80.

86. *Id.,* ¶ 31 (citing Declaration of Jason Smith in Opposition to Plaintiff's Motion for Class Certification ("Smith Decl."), Docket No. 210 (Feb. 15, 2012), ¶ 36). Smith states that the 2003, 2004, and 2007 bulletins apply to 866 vehicles, 15,624 vehicles, and 23,468 vehicles respectively. He also asserts that 97.14% of the vehicles that were covered by the service bulletins have had their nozzles removed. (Smith Decl., ¶ 37.) Cholakyan objects that Smith's testimony concerning the completion rate lacks foundation; he does not similarly object to Smith's testimony regarding the number of vehicles to which the service bulletins applied. (Evidentiary Objections to the Declaration of Jason Smith in Support of Defendant's Opposition to Plaintiff's Motion for Class Certification, Docket No. 201 (Feb. 21, 2012).) As respects Cholakyan's objection to Smith's testimony regarding the bulletins' completion rate, Smith has been designated as an expert witness; he is employed as defendant's Shop Foreman for Technical Engineering Services, Dealer Workshop Services. He states that in this position, he has personal knowledge of the DTBs and service campaigns at issue. Personal knowledge can be inferred from a declarant's position or participation in the matters about which he is testify-

ing. See *Barthelemy, v. Air Lines Pilots Ass'n.,* 897 F.2d 999, 1018 (9th Cir.1990).

 Cholakyan also objects to Smith's testimony because evidence regarding the completion rate under the service bulletins was not produced during discovery. Once again, the objection does not address Smith's testimony concerning the number of vehicles covered by the service bulletins, which, as discussed *infra*, is the more relevant fact. As defendant notes, moreover, Smith testified as to the completion rate during his deposition, and plaintiff neither objected nor asked follow-up questions at that time. (Yoshino Decl., Exh. 6 ("Smith Depo.") at 268:3–19). See *Franklin v. Sac. Area Flood Control Agency,* No. CIV. 07–1263 WBS GGH, 2009 WL 2399569, *6 (E.D.Cal. Apr. 29, 2009) ("court overrules defendants' objection to plaintiff's testimony concerning other managers' timekeeping for lack of personal knowledge and lack of foundation. The record indicates that defendants did not challenge plaintiff's statements at the time of the deposition"); see also 8 Charles Alan Wright & Arthur R. Miller, FEDERAL PRAC. & PROC § 2113 (2010) ("A party waives any objection, whether to the form of questions or answers or to other errors that might be obviated, removed, or cured if promptly presented, by failing to note the objection at the taking of the deposition").

87. Smith Decl., ¶¶ 2–3.

(C.D.Cal.2006) ("The Court notes that both sides have adopted a strategy of blunderbuss, repetitive, blanket objections to the declarations submitted on this motion. The Court finds this strategy an unhelpful diversion"). Because evidentiary rules unrelated to expert testimony are not applied with rigor in deciding motions for class certification, all authentication and lack of foundation objections are overruled. See *Velazquez v. Costco Wholesale Corp.*, 2011 WL 4891027, at *2 ("[T]o the extent the Court relies on evidence to which the parties object, the Court overrules the objections. This is because at the class certification stage, the Court makes no findings of fact, nor any ultimate conclusions on Plaintiffs' claims, and the Court may consider inadmissible evidence"); *Keilholtz v. Lennox Hearth Prods.*, 268 F.R.D. 330, 337 n. 3 (N.D.Cal.2010) ("Therefore, 'the Federal Rules of Evidence take on a substantially reduced significance, as compared to a typical evidentiary hearing or trial' ").

 Even were the court to apply a rigorous evidentiary standard, such as that used on motions for summary judgment, a court can admit evidence that can be presented in admissible form at trial. "At the summary judgment stage," courts "do not focus on the admissibility of the evidence's form. [They] instead focus on the admissibility of its contents." See *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir.2001), and *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)); see *Cutrona v. Sun Health Corp.*, No. CV 06–2184–PHX–MHM, 2008 WL 4446710, *7 (D.Ariz. Sept. 30, 2008) (on summary judgment, "hearsay is admissible if there is any way to present it in an admissible form at trial"). The court will thus consider and rule on the remaining objections only to the extent it relies on the evidence in question.

**B. Whether the Proposed Class Should Be Certified**

A district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.PROC. 23(a).

In addition, a district court must also find that at least one of the several conditions set forth in Rule 23(b) is met. "The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), amended by 273 F.3d 1266 (9th Cir.2001); see also *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992). As the Supreme Court has explained:

"Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of either '(A) inconsistent or varying adjudications,' or '(B) adjudications ... that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.' Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Dukes*, 131 S.Ct. at 2549 n. 2.

Rule 23(b)(2) applies when " 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.' " *Id.* at 2548–49.

 "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551. See also *Zinser*, 253 F.3d at 1186 ("[t]he

party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met"); *Hanon,* 976 F.2d at 508.[88] The court can certify a class only if it "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160–61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Supreme Court has noted that "[f]requently ... 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes,* 131 S.Ct. at 2551.

## 1. Rule 23(a) Requirements

The proposed class suffers from numerous deficiencies. The court therefore declines to address each Rule 23(a) factor, and discusses only the requirements Cholakyan has failed to meet: commonality and typicality.

### a. Commonality

Commonality requires that there be "questions of law or fact common to the class." See FED.R.CIV.PROC. 23(a)(2). The commonality requirement is construed in a relatively liberal fashion, and the existence of some common legal and factual issues is sufficient. *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1320 (9th Cir.1982). As the Ninth Circuit has noted: The commonality requirement demands only that "class members' 'situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'" *Wolin v. Jaguar Land Rover North America, LLC,* 617 F.3d 1168, 1172 (9th Cir.2010) (quoting *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.,* 917 F.2d 1171, 1175 (9th Cir.1990)); see also *Mazza v. American Honda,* 666 F.3d 581, 589 (9th Cir.2012) (characterizing commonality as a

"limited burden," stating that it "only requires a single significant question of law or fact ...," and concluding that "[e]ven assuming *arguendo* that we were to agree with Honda's 'crucial question' contention, the individualized issues raised go to pre[dominance] under Rule 23(b)(3), not to whether there are common issues under Rule 23(a)(2). Honda does not challenge the district court's findings that common questions exist as to whether Honda had a duty to disclose or whether the allegedly omitted facts were material and misleading to the public").

The putative class' "claims must depend upon a common contention[, however].... That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. Although for purposes of Rule 23(a)(2) even a single common question will do, *id.* at 2556, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L.REV. 97, 132 (2009)). As the Ninth Circuit recently noted by way of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for promotion?' Instead, they must pose a question that 'will produce a common answer to the crucial question why was I disfavored.'" *Ellis,* 657

**88.** Defendant contends that Cholakyan must satisfy Rule 23's requirements by a preponderance of the evidence, citing out-of-circuit authority. See *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 321 (3d Cir.2008) ("Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence"); *Teamsters Local 445 v. Bombardier, Inc.,* 546 F.3d 196, 202 (2d Cir.2008) ("[W]e dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's require- ments"). "The Supreme Court[, however,] has yet to decisively attach a standard of proof to Rule 23 requirements." *Gregurek v. United of Omaha Life Ins. Co.,* No. CV 05–6067–GHK (FMOx), 2009 WL 4723137, *5 (C.D.Cal. Nov. 10, 2009), and defendants cite no Ninth Circuit authority that directs use of a preponderance standard in deciding class certification motions. Because that is the general standard of proof used in civil cases, however, the court applies it here.

F.3d at 981 (quoting *Dukes*, 131 S.Ct. at 2552).

Cholakyan identifies multiple common questions that he contends will produce a common answers apt to drive resolution of the litigation. His central point, however, is that the class vehicles have a unitary "water management system" that is uniformly defective. He asserts that defendant knew of a "design defect" in the class vehicles, i.e., that they were "susceptible to clogging."[89] Cholakyan maintains that this susceptibility leads to "water leaking into the vehicle interior," which in turn "can lead to severe safety issues and electrical system failures...."[90] These safety problems and electrical failures form the gravamen of his complaint; they are critical to his ability to show materiality on his consumer protection claims, and to proving that the vehicles did not perform as warranted.

Assuming *arguendo* that class vehicles experience water leaks, and that the leaks have a propensity to cause electrical malfunctions, the crucial question that must be answered is why each class member's vehicle experienced water leaks. Cholakyan's attempt to demonstrate that this question has a common answer for all class vehicles fails for several reasons. First, despite his efforts to identify a "water management system" in the class vehicles, the evidence that has been adduced shows that this so-called "system" is in fact an amalgamation of many different vehicle parts. There is no evidence that these disparate parts are conceptually part of a single system or physically connected to one another in any material way.

Plaintiff's own expert defines the "system" as "the overall system—made up of *several sub-systems and their components* ...."[91] The two primary "sub-systems" Cholakyan identifies are the "Cowl Drainage System, which [he contends] includes the cowl panel, cowl drain, cowl drain tube, A–Pillar drains, wheelhouse drains, and wheelhouse drain nozzles," and the "Sunroof Drainage System, which includes the sunroof channels, sunroof drains, sunroof drain tubes, and sunroof drain valves."[92] In combination, these "sub-systems" involve at least *ten* different vehicle parts, each of which may or may not be defectively designed, and each of which may or may not be causally linked to the alleged water leak defect. There is no evidence that the "cowl drainage system" and the "sunroof drainage system" are in any way connected; this means that at best, there are two independent systems at issue. Cholakyan proffers service bulletins related to "drains located in the front wheelhouses" as evidence of an alleged defect in the "water management system."[93] Although he contends that the front wheelhouse drains are part of the purported "Cowl Drainage System," there is no evidence supporting this assertion. Instead, the wheelhouse drains appear to function independently of the components identified as elements of the "Cowl Drainage System" and the "Sunroof Drainage System." As a result, Cholakyan has potentially placed a *third* set of vehicle components at issue.[94]

89. Motion at 17.

90. *Id.* at 1.

91. Waters Decl., ¶ 1 n. 1. Waters testified at his deposition that the parts of the vehicle he was discussing were "not connected in any way," and agreed that the parts were "separate and have separate pipes and routes...." (Waters Depo. at 137:4–9.)

92. *Id.*

93. Declaration of Payam Shahian in Support of Plaintiff's Motion for Class Certification ("Shahian Decl."), Docket No. 175 (Feb. 3, 2012), Exhs. 13–15 (2004 and 2007 service bulletins). These service bulletins state "it is possible that the water drains located in the front wheelhouses may not drain water properly," and that this problem may be resolved by removing a "water drain nozzle" from the drains. (*Id.*)

94. The vehicles' cowls contain three drains-a center drain that drains water toward the front fender cavity, where it exits the vehicle, and two auxiliary cowl drains that divert water toward the ground. (Caulfield Decl., ¶¶ 19–20.) The wheelhouse drains, by contrast, are located in the vehicles' engine compartments, which is separated from the cowl drains by a raised and sealed barrier. (*Id.*, ¶¶ 27–28.) Cholakyan's expert suggests that the wheelhouse drains are connected in some fashion to the "Cowl Drainage System" (see Waters Decl., ¶¶ 42–44), but there is no evidence that the wheelhouse drains are in any way linked to the cowl drains. (Caufield Decl., ¶ 29 ("The wheelhouse drains are

Putting aside whether any of these "systems" clog to the extent that they cause electrical malfunctions in the vehicles, Cholakyan has failed to establish that they are connected with one another or that they are designed to work in concert. There is also no evidence that a single design flaw that is common across all of the drains in question is responsible for the alleged water leak defect.[95] Does a problem with the "cowl drainage system" necessarily implicate the "sunroof drainage system" or suggest that it has a similar problem? Does a malfunction in the wheelhouse drains necessarily indicate that there is something wrong with the sunroof or cowl drainage systems? Do any of these systems suffer from a common, identifiable design flaw that causes them to have a "propensity to clog" for a uniform reason? Cholakyan offers no answer to any of these questions. His silence compels the conclusion that putative class members could trace alleged water leaks to one of several independently operating vehicle components, each of which may or may not be functioning properly.

In other cases involving alleged vehicle defects, plaintiffs have identified a single part or unified system within the vehicle as the alleged source of problems. See *Mazza*, 666 F.3d at 584 (holding that commonality was satisfied where all class vehicles allegedly suffered from a defect in a single collision brake management system described in marketing materials and sold as part of a technology package); *Wolin*, 617 F.3d at 1170–71 (holding that plaintiff had shown commonality where all class vehicles suffered same "geometry defect in the vehicles' alignment").

Cholakyan's failure to identify a single part or system that is the cause of the water leaks defeats commonality. See *Heisler v. Maxtor Corp.*, No. 5:06–cv–06634–JF (PVT), 2010 WL 4788207, *4 (N.D.Cal. Nov. 17, 2010) ("[T]he commonality prerequisite of Rule 23(a) is not satisfied, as Plaintiffs have not identified a specific defect in Maxtor's manufacturing process.... Plaintiffs contend that Ninth Circuit precedent does not require the manifestation of a common defect for purposes of class certification.... Plaintiffs cannot show that a common defect exists simply by making conclusory allegations that Maxtor's manufacturing process is substandard"); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 167 (S.D.N.Y.2003) ("Accordingly, this Court finds that the issues of design defect and negligent design are not common to the class due to the numerous products included in the class. Each product must be individually reviewed to balance its risks, utilities, benefits, and feasible safer alternatives. That is not a common class-wide issue"). Cf. *Oscar v. BMW of North America, LLC*, 274 F.R.D. 498, 510 (S.D.N.Y.2011) ("Oscar has not provided the court with any evidence that Goodyear RFTs are likely to fail because of a particular defect. The failure to specify an alleged common defect provides a further basis for concluding that plaintiff has not demonstrated predominance"); *In re Hitachi Television Optical Block Cases*, No. 08cv1746 DMS (NLS), 2011 WL 4499036, *5 (S.D.Cal. Sept. 27, 2011) ("Plaintiffs do not appear to dispute that these differences exist. Instead, they argue the differences are immaterial. However,

---

thus not part of the cowl or 'Cowl Drainage System' as plaintiff's experts claim"); Smith Decl., ¶¶ 12–13 (explaining that "wheelhouse drains do *not* drain water collected by or diverted from the cowl. Instead, the wheelhouse drains drain water that comes through the air intake grate within the hood of the vehicle" (emphasis original)).)

95. The parties expend significant energy disputing the relevance and meaning of a certain snippet of testimony given by Gary Bowne, one of defendant's persons most knowledgeable. (Waters Decl., Exh. C ("Bowne Decl.").) The testimony in question is:

"Q: Can you please tell me where all the water drains are located in the W211 vehicle?

A: Okay. There are three drains at the front cowl, two on the outside, one in the middle, that take water away from the windshield area. There are four drains for the sunroof, two that run down the A-pillar, two that run to the rear of the vehicle, to the wheelhouse. There are drains in each wheelhouse. And I believe that is it." (*Id.* at 50:15–51:1.)

Cholakyan asserts that Bowne admitted that all class vehicles have the same water drains. His testimony, however, indicates only that all of the vehicles have drains in the same locations. Bowne expresses no opinion as to whether the drains are similar in all material respects across the entire class of vehicles, nor does his statement demonstrate that there is a unified "water management system" in the vehicles.

this argument misses the mark on a motion for class certification, which requires the Court to determine whether the claims can be adjudicated on a representative basis. If there are differences in the product design, or differences in the product parts that make up the design, both of which exist here, that standard is not met").[96]

Beyond Cholakyan's inability to identify a single system causing the water leaks, the parties adduce evidence that there is substantial design variation among the class vehicles. Cholakyan's proposed class definition includes owners and lessees of Model 211 vehicles manufactured and sold over six years. As one example of this variation, Cholakyan relies on defects in the purported "sunroof drainage system." Not all the class vehicles even *have* a sunroof, however, much less a drainage system connected to a sunroof.[97] There is also variation in vehicles that have sunroofs, specifically in whether they have drain tubes that run down the A-

pillars and exit through the areas identified in the DTBs.[98] Additionally, the design of the vehicles varied from year to year, further undercutting Cholakyan's evidence of commonality.[99] While it is not entirely clear that these variations are material to the functioning of the vehicles' drains, it is Cholakyan's burden to demonstrate commonality, and he has failed convincingly to rebut defendant's evidence regarding the lack of an integrated water management system and regarding design variations among class vehicles.

Plaintiff's primary evidence of the existence of a common defect is defendant's DTBs and service bulletins.[100] As an initial matter, DTBs and service bulletins are promulgated to help defendant's dealers and service providers address possible problems with the vehicles. Although they may constitute evidence that there is a classwide problem, they are not conclusive proof that a common defect affects all the vehicles in

96. Cholakyan relies heavily (indeed, almost exclusively) on *Parkinson v. Hyundai*, 258 F.R.D. 580 (C.D.Cal.2008), for the proposition that "[t]he law is clear that the defect need not be limited to a single part, but can be a defect in an entire system." (Reply at 17; see also *id.* at 13–17 (citing *Parkinson* in support of his position that a "system" defect is sufficient under Rule 23(a)).) *Parkinson* provides inadequate support for certification of a class in this case. First, *Parkinson* was decided pre-*Dukes*, which clarified that more than a merely hypothetical common question must be identified. Instead, a plaintiff must adduce evidence that the alleged injuries of *all* class members can be traced to the same source of injury. Second, the *Parkinson* court did not conduct a particularly extensive analysis of the vehicle defect in question, as it appeared undisputed that the alleged defect affected a unitary system that functioned in a similar fashion across all class vehicles. See *id.* at 590 (summarizing defendant's opposition, which did not dispute the existence of unitary system). Third, even assuming the validity of Cholakyan's position that "[d]efects need not be limited to a single part" (Reply at 13), it remains the case that he has failed to adduce evidence that a single *system* is at issue.

97. Caulfield Decl., ¶¶ 9(d), 53. Caulfield also acknowledges that even in vehicles that have sunroofs, the sunroofs are not *necessarily* the same design. (*Id.*, ¶¶ 54–55; Smith Decl., ¶ 5.)

98. Caulfield Decl., ¶¶ 53–54.

99. Smith Decl., ¶ 5 ("W211s come as both sedans and station wagons and ... include at least

56 different vehicle types.... The various types of W211s have different bodies, design, drainage parts and components, and other features"); Caulfield Decl., ¶ 21 (stating that "overall shape and dimensions of the cowl" vary among W–211s).

100. Motion at 9 n. 5 (citing various DTBs and service bulletins for a description of alleged defect). Waters also relied heavily on the DTBs to support his opinion that the class vehicles suffered from a common defect:

"A: When I spoke to Mr. Potok last night, he said his thoughts were that if there was enough volume, that that A-pillar would fill up and when it would enter the vehicle, that it was slow coming out. So if you did have a good rain downpour or whatever, that it's very possible that it could have backed up into the vehicle.

. . . . .

I believe that if the water were to sit in there for a long enough period of time, it would find a way into the vehicle through a seam sealer or whatever....
Q: Tell me what basis you have for your belief.
A: The DTBs talk about it.
Q: And that's it? That's the only basis?
A: Well, that's pretty good documentation.

. . . . .

Q: So the DTB is the only basis you have for your belief that you've told us about; is that correct?
A: Yes." (Waters Depo. at 197:8–203:14.)

question. See *Erlandson v. Ford Motor Co.*, No. 08–CV–1137–BR, 2009 WL 3672898, *4 (D.Or. Oct. 30, 2009) ("Plaintiffs rely on the TSB published by Defendant, which they assert amounts to an admission that a defect in Ford Windstars allows moisture to enter the PCM module through the vehicle's cowl. Plaintiffs argue Defendant's general acknowledgment of this problem in some Windstars is sufficient for Plaintiffs to prosecute—and for Defendant to defend against—their claim to a jury as to their specific Windstar. The Court notes the TSB does not constitute an admission by Defendant that a defect exists in all Windstars because it is no more than a recommended repair method for Windstars experiencing problems with moisture entering the PCM").

Even were the court to consider the DTBs as evidence of a defect, however, the bulletins discuss a range of different vehicle parts.[101] The DTBs are also limited to certain subsets of putative class vehicles, meaning that no single DTB applies to all of the class vehicles.[102]

Cholakyan also relies on a series of service campaign bulletins issued in 2004 and 2007, which address potential problems in the wheelhouse drains of certain class vehicles.

He contends these service bulletins show that "the water drains located in the front wheelhouses ... may not drain water properly." [103] To rectify this problem, the bulletins suggest removing the wheelhouse drain nozzles to prevent the obstruction of water flow.[104] As noted, Cholakyan has failed to establish that the wheelhouse drains are connected with any of the other drains or vehicle parts that purportedly cause water to enter the vehicles and lead to electrical malfunctions; indeed, the evidence suggests the opposite is true.[105] The service bulletins, moreover, suggest that different vehicles are equipped with different versions of the drain nozzle, indicating that the nozzle found on class vehicles is not the same design.[106] In addition, Cholakyan has not demonstrated that the service bulletins apply to the class as a whole. Each of the bulletins states that it applies to a certain group of class vehicles and to certain serial number ranges. The bulletins do not confirm that they apply to all class vehicles.[107] For these reasons, the court concludes that the DTBs and service bulletins do not carry Cholakyan's burden of demonstrating that all vehicles have a common defect.[108]

---

**101.** Waters Decl., Exh. G ("2008 DTB") (describing "possible causes" of water leaks as "[b]locked water drain in the upper longitudinal member under the front fender," "lack of seam sealer on the double panel of the firewall/longitudinal member," and "mounting hole for the tilting/sliding roof drain hose"); *id.*, Exh. I ("First 2002 DTB") ("Water may enter the vehicle through the entry point of the air conditioning line"); *id.*, Exh. J ("Second 2002 DTB") (identifying possible cause of water leaks as "blocked drain valve on the fuse box"); *id.*, Exh. K ("2003 DTB") ("water drains located in the front wheelhouses ... may not drain water properly").

**102.** See Smith Decl., ¶¶ 29–32 (observing that none of the DTBs purport to cover all class vehicles).

**103.** Shahian Decl., Exhs. 13–15 (2004 and 2007 service bulletins).

**104.** *Id.;* Smith Decl., ¶¶ 33–34.

**105.** Smith Decl., ¶ 34; Caulfield Decl., ¶¶ 27–29.

**106.** Shahian Decl., Exh. 15 at 136 (2007 DTB indicating that there were at least two different versions of the nozzle).

**107.** The service bulletins state that they apply to approximately 2,640 vehicles (March 2004 bulletin), 55,399 vehicles (October 2004 bulletin), and 86,299 vehicles (January 2007 bulletin). (Shahian Decl., Exhs. 13–15.) As noted, Smith testified that the service campaigns involved 866 vehicles (2003 bulletin), 15,624 vehicles (2004 bulletin), and 23,468 vehicles (2007 bulletin) respectively. Smith does not explain why his numbers differ from those included in the bulletins. The bulletins, however, clearly reflect that not all class vehicles were "involved" in the service campaigns being announced. The bulletins direct dealers to check a Vehicle Master Inquiry to insure that a particular vehicle is involved in the campaign, and to determine if the vehicle has previously been repaired. (See, e.g., Shahian Decl., Exh. 15.) Finding that a single service bulletin applies to the putative class as a whole is thus precluded.

**108.** Causation problems also stand in the way of identifying common issues here. Environmental circumstances, use factors, and a vehicle owner's maintenance habits all contribute to whether or not the vehicle's drains clog. (Caulfield Decl., ¶¶ 8, 12, 125.) Before *Dukes*, such considerations were primarily addressed in assessing predominance under Rule 23(b)(3). See, e.g., *Wo-*

In sum, Cholakyan has approached commonality by identifying various unconnected vehicle parts and systems and denominated them a unified "water management system" that gives rise to defects common to all class vehicles. " '[A]t a sufficiently abstract level of generalization, [however,] almost any set of claims can be said to display commonality.' " *Ballew v. Matrixx Initiatives, Inc.*, No. CV–07–267–RHW, 2008 WL 4831481, *3 (E.D.Wash. Oct. 31, 2008) (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998)). Cholakyan has not adduced evidence that there is a single source of the alleged injuries suffered by putative class members, as *Dukes* demands. Consequently, he has failed to demonstrate the existence of a common question susceptible of class-wide adjudication.

#### b. Typicality

Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members he seeks to represent. See FED.R.CIV. PROC. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998). "The test of typicality is whether other mem-

bers have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation and internal quotations omitted). In practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364. See also *Dukes*, 131 S.Ct. at 2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence,' " citing *Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364).

Typicality may be found lacking "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.' " *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)). To be typical, a class member need

---

*lin*, 617 F.3d at 1174 ("Whether each proposed class member's tires wore out, and whether they wore out prematurely and as a result of the alleged alignment defect, are individual causation and injury issues that could make classwide adjudication inappropriate"); *Frosini v. Bridgestone Firestone North American Tire, LLC*, No. CV 05–0578 CAS (RZx), 2007 WL 2781656, *15 (C.D.Cal. Aug. 24, 2007) ("[T]he trier of fact would have to take into account individual issues with respect to the performance of any Steeltex tire to determine if it had failed or was likely to fail due to a manufacturing or design defect, and thus, these individual issues predominate"). The *Dukes* Court, however, relied in part on individualized causation issues in holding that the proposed class had failed to demonstrate commonality. See *Dukes*, 131 S.Ct. at 2554–55 ("[L]eft to their own devices most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all. Others may choose to reward various attributes that produce disparate impact—such as scores on general aptitude tests or educational achievements. And still other man-

agers may be guilty of intentional discrimination that produces a sex-based disparity. In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." (internal citations omitted)).

It is true that even after *Dukes*, the Ninth Circuit has held that a plaintiff has only a "limited burden" in demonstrating commonality. *Mazza*, 666 F.3d at 589. Nonetheless, the fact that causation may raise numerous individualized issues indicates that it would be difficult to try the case on a classwide basis. Cf. *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 337 (D.D.C. 2011) ("Based upon the totality of its experience in this litigation—most notably, the complicated and extended history of discovery—and having looked ahead to determine how certain issues might be addressed at trial, the Court is left convinced that the continued certification of the class will not advance the principal purpose of the class action device—i.e., advancing 'the efficiency and economy of the litigation.' " (citing *Falcon*, 457 U.S. at 159, 102 S.Ct. 2364); *In re Paxil Litig.*, 212 F.R.D. 539, 546 (C.D.Cal.2003) (identifying an "unworkable trial plan" as basis for denying class certification).

not prove that he is immune from any possible defense, or that his claim will fail only if every other class member's claim also fails. Instead, he must establish that he is not subject to a defense that is "[a] typical of the defenses which may be raised against other members of the proposed class." *Id.;* see also *Ellis,* 657 F.3d at 984.

 As discussed at length in the court's order on the earlier motion to dismiss, Cholakyan's standing to assert the claims he pleads in this action—most particularly, claims based on the defects enumerated in the 2008 DTB—is sufficiently in doubt that the court was unable to resolve the issue by applying a summary judgment-type standard to decide defendant's Rule 12(b)(1) motion.[109] While the court has not yet resolved the question, the typicality inquiry does not demand proof that a defense will ultimately defeat the class representative's claims. Instead, it asks only whether plaintiff is likely to be preoccupied with litigating the defense to the detriment of the class as a whole. "[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *J. H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7th Cir.1980). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *Id.*

The substantial resources already devoted to litigation of Cholakyan's standing alone call into question his ability to demonstrate typicality. See *Gartin v. S & M NuTec LLC,* 245 F.R.D. 429, 435 (C.D.Cal.2007) ("Plaintiff's claim is not typical because her claims are so unique and subject to particular

defenses that litigation of the action is likely to be overwhelmed by addressing her individual claims. Thus, because Plaintiff seeks different relief than many class members and presents a unique case, her claims are not typical of those presented by putative class members" (internal citations omitted)).

 The court's commonality analysis also influences its assessment of Cholakyan's typicality. Cholakyan is a current owner of a class vehicle who seeks to represent not only all current owners, but all former owners as well. The fact that former owners can avail themselves of a different set of remedies than current owners undercuts the typicality of his claims. See *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 338 (4th Cir.1998) ("[I]n making the class certification decision the district court might reasonably have been concerned that plaintiffs' residual, forward-looking interest, as current franchisees, in Meineke's continued viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees"); cf. *Ellis,* 657 F.3d at 986 ("Plaintiffs not employed by Costco throughout this case do not have standing to seek injunctive relief. As former employees, Ellis and Horstman would not share an interest with class members whose primary goal is to obtain injunctive relief. Thus, as the class currently stands, Ellis and Horstman will not adequately protect the interests of the class as a whole").[110]

Moreover, the evidence of variation among class vehicles indicates that Cholakyan's ownership of one type of class vehicle does not necessarily render his claims typical of the class as a whole. For example, his vehicle has a sunroof, while other vehicles in the class do not.[111] There is also evidence that the sunroof on Cholakyan's vehicle has mechanical problems and may not close com-

---

**109.** Order Denying Defendant's Motion to Strike, Setting Evidentiary Hearing on Defendant's Motion to Dismiss Under Rule 12(b)(1) ("MTD Order"), Docket No. 149 (Jan. 12, 2012). The parties expend much effort relitigating whether Cholakyan has, in fact, experienced water leaks that are attributable to the defects alleged in the complaint. As noted *infra,* the court will soon calendar an evidentiary hearing on plaintiff's standing to pursue this action, after which that question will be conclusively resolved. The court

declines to address the parties' arguments respecting standing here, except to the extent they bear on class certification.

**110.** As the court discusses *infra,* this tension also raises serious questions concerning Cholakyan's adequacy.

**111.** *Id.,* ¶ 53.

pletely; this alone could result in water entry into the interior.[112] Cf. *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 666–67 (C.D.Cal. 2009) (concluding that a class representative who had purchased only one of three products could not assert claims typical of a putative class of individuals who purchased all three products).[113] Cholakyan has therefore failed to demonstrate that his claims are typical of those of the putative class.

## 2. Whether Plaintiff Has Satisfied Rule 23(b)(2)

While Cholakyan's failure to meet all of Rule 23(a)'s requirements is sufficient to defeat his motion for class certification, he has also failed to satisfy Rule 23(b)(2). That rule authorizes certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." Fed.R.Civ.Proc. 23(b)(2). Two elements must be shown before an action can proceed under Rule 23(b)(2): "(1) the opposing party's conduct or refusal to act must be 'generally applicable' to the class and (2) final injunctive or corresponding declaratory relief must be requested for the class.'" 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3d § 1775, at 41 (2005).

■ "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 131 S.Ct. at 2557 (quoting Nagareda, 84 N.Y.U. L.Rev. at 132). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.* This does not mean that class actions certified under Rule 23(b)(2) cannot include claims for monetary damages; "monetary damage requests are generally allowable[, however,] only if they are merely incidental to the litigation." *Kanter v. Warner–Lambert Co.*, 265 F.3d 853, 860 (9th Cir.2001); see also Fed.R.Civ.Proc. 23(b)(2), Advisory Committee's Notes (1966) ("The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").[114]

■ As noted, the pending motion represents a significant shift in strategy by Cholakyan. Cholakyan originally sought certification under Rule 23(b)(3).[115] Throughout the litigation, Cholakyan primarily sought monetary, rather than declaratory or injunctive, relief; the parties litigated the case on this basis. Cholakyan has now filed a motion asserting an entirely different basis for certification, apparently disavowing any claim that class members are entitled to compensatory damages. This change has caused the

---

112. *Id.*, ¶ 65.

113. Problems with a class representative's typicality can sometimes be cured by giving plaintiff leave to amend his complaint or to substitute a new class representative. See, e.g., *Sueoka v. United States*, 101 Fed.Appx. 649, 654 (9th Cir. 2004) (Unpub. Disp.) (holding that "granting leave to amend the complaint to name representatives of each of the remaining subclasses would not have been a futile act" since other named plaintiffs could have been found that did not have typicality or adequacy problems). In this order, however, the court details multiple barriers to certification of a class, including lack of commonality and inability to satisfy Rule 23(b)(2)'s requirements. Each of these provides a separate and independent basis for denying

class certification. Consequently, giving plaintiff leave to amend his complaint to cure typicality problems and to file a renewed motion would be futile.

114. The *Dukes* Court rejected the notion that injunctive and declaratory relief claims that "predominate" over claims for individualized damages could be certified under Rule 23(b)(2). It declined to reach the broader issue as to whether claims for monetary damages could *ever* be included in a Rule 23(b)(2) class, however. 131 S.Ct. at 2557–58.

115. Original Motion at 19–24 (asserting that Rule 23(b)(3) certification was appropriate, and arguing that the predominance and superiority requirements were met).

court to review the declarations and injunctions he now seeks with some care. Having conducted that review, the court observes that no single declaration or injunction sought would benefit the class as a whole. First, the class includes former owners of class vehicles who will not benefit from declaratory or injunctive relief.[116] As the *Dukes* Court noted in concluding that Dukes' proposed class did not satisfy Rule 23(b)(2) requirements, the class included a large number of former employees who "ha[d] no claim for injunctive or declaratory relief at all." *Dukes*, 131 S.Ct. at 2560. It deemed the alternate solution of "excising plaintiffs from the class" as they lose standing "wasteful of the District Court's time." *Id.*

As in *Dukes*, the declaratory relief claims will result in no tangible benefit to former owners. As for the injunctive relief Cholakyan requests, current vehicle owners may be able to take advantage of the information dissemination programs sought, as well as the addition of "water management system maintenance" to the vehicles' regular maintenance schedule. None of the requested relief will benefit former owners, however, with the exception of a program "whereby current and former … owners and lessees who paid for repairs to the Water Management System that are covered by Defendant's adjustment programs may be reimbursed." Even this relief will not benefit the class as a whole, or even all former owners, moreover, as it will aid only those class members whose vehicles manifested a defect requiring repair, and who elected to pay to have the repairs performed.

█ Consequently, *none* of the remedies Cholakyan seeks will result in classwide relief. Plaintiff cannot seek certification under Rule 23(b)(2) by combining an array of remedies, some of which will benefit only certain subsets of the class, and contending that each member of the class can avail himself or herself of one or more of the proposed remedies. Rule 23(b)(2) demands that plaintiff seek "an indivisible injunction benefitting all its members at once." *Dukes*, 131 S.Ct. at 2558. *See Schulken v. Washington Mut. Bank*, No. 09–CV–02708–LHK, 2012 WL 28099, *7 (N.D.Cal. Jan. 5, 2012) ("[T]he future injunctive and declaratory relief sought is not appropriate for the class as a whole. Plaintiffs seek an order enjoining Chase from future suspensions or reductions of HELOCs. The classes Plaintiffs seek to certify include both class members that still maintain HELOCs with Chase and class members who, like the Schulkens, no longer maintain HELOCs with Chase. For those class members who no longer have HELOCs with Chase, it is unclear why these class members would need the requested relief because they are not currently in a position to benefit from a change in Chase's policies and practices"); *Gonzales v. Comcast Corp.*, No. 10–cv–01010–LJO–BAM, 2012 WL 10621, *16 (E.D.Cal. Jan. 3, 2012) ("[B]ased on the proposed class definitions, the vast majority of class members would have no claim for injunctive relief, because they are, by definition, former Comcast subscribers. The only class members who would have a claim for injunctive relief are those that are identical to Plaintiff, i.e., cancelled and then re-subscribed to Comcast's services. But this would appear to be a tiny fraction of the proposed classes, and there is nothing in the evidence to suggest otherwise"); compare *Yoshioka v. Charles Schwab Corp.*, No. C–11–1625 EMC, 2011 WL 6748984, *7 (N.D.Cal. Dec. 22, 2011) ("Plaintiffs satisfy the requirement in this case because the requested relief, and the relief to be provided pursuant to the Settlement Agreement, consists of a single amendment to the IRA agreement that would apply class-wide" (emphasis added)).

Despite Cholakyan's assertion that the primary relief he seeks is declaratory and in-

---

**116.** Declaration of Joseph Haller in Support of Opposition to Class Certification Motion ("Haller Decl."), Docket No. 187 (Feb. 13, 2012), ¶ 11 (stating that there are approximately 100,000 class vehicles, that many are close to ten years old, and that because a typical lease period is two to three years, it is "not unreasonable" to believe that many putative class members are

former lessees/owners). Cholakyan objects to this statement as speculative. Haller's testimony is a reasonable extrapolation of known facts, however, including the fact that class vehicles were manufactured over a period of six years, the fact plaintiff seeks to represent both former and current owners and lessees, and the fact that the average lease lasts two to three years.

junctive in nature, moreover, he has included among the injunctions he seeks one that would require defendant to establish a program to reimburse owners or lessees who paid to repair damage caused by the alleged water leak defect. Specifically, he seeks to compel defendant to "implement a program whereby current and former Model 211 owners and lessees who paid for repairs to the Water Management System" will be reimbursed for their costs, "as the Secret Warranty Act requires ..." [117] CAL. CIV.CODE § 1795.92(a) (requiring a manufacturer, within "90 days of the adoption of an adjustment program ... [to] notify by first-class mail all owners or lessees of motor vehicles eligible under the program of the condition giving rise to and the principal terms and conditions of the program"); id., § 1795.92(d) ("A manufacturer who establishes an adjustment program shall implement procedures to assure reimbursement of each consumer eligible under an adjustment program who incurs expenses for repair of a condition subject to the program prior to acquiring knowledge of the program. The reimbursement shall be consistent with the terms and conditions of the particular program. The manufacturer shall notify the consumer within 21 business days of receiving a claim for reimbursement whether the claim will be allowed or denied. If the claim is denied, the specific reasons for the denial shall be stated in writing"). While this relief is characterized as an injunction, the end result would be individualized monetary payments to qualifying class members.

Cholakyan clearly appreciates that seeking compensatory damages would cast doubt on the propriety of certifying a class under Rule 23(b)(2). See Dukes, 131 S.Ct. at 2557 ("[A]t a minimum, claims for individualized relief ... do not satisfy the Rule.... [Rule 23(b)(2)] does not authorize class certification when each class member would be entitled to an individualized award of monetary damages"); Troy v. Kehe Food Distributors, Inc., 276 F.R.D. 642, 656 (W.D.Wash.2011) ("[A]ccording to the Court, predominance and superiority are not self-evident with respect to each class member's claim for money, and 'depriving people of the right to sue'

by approving a mandatory class absent notice and opt-out rights would violate due process," citing Dukes ). The purported "injunctive" relief he seeks mandating the establishment of an adjustment program would have the same effect, essentially placing the onus on defendant to assess the compensation due individual class members, rather than resolving the issue of individualized relief in the context of the litigation. It thus appears that Cholakyan's request for an injunction creating a reimbursement program under the Secret Warranty Law is designed to avoid the need to comply with Rule 23(b)(3) while preserving the possibility that some class members will be able to obtain monetary relief. The Seventh Circuit recently discussed the reasons why such a class should not be certified under Rule 23(b)(2):

> "That the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final.... The relief sought here does not come close to satisfying Rule 23(b)(2)'s standard. That much is clear from the intricate remedial scheme ordered by the district court, which requires thousands of individual determinations of class membership, liability, and appropriate remedies. *While the compensatory-education remedies will often or always be injunctive in nature, there can be no single injunction that provides final relief to the class as a whole.* It is no answer to say that the June 9 remedial order affects the entire class; *that order merely establishes a system for eventually providing individualized relief. It does not, on its own, provide 'final' relief to any class member.*" Jamie S. v. Milwaukee Public Schools, 668 F.3d 481, 499 (7th Cir. 2012) (emphasis added).

See also Richards v. Delta Air Lines, Inc., 453 F.3d 525, 531 (D.C.Cir.2006) ("Richards sought, on behalf of her proposed class, a

---

117. Motion at 23.

declaratory judgment that Delta wrongly availed itself of the Warsaw Convention's baggage-liability limit and 'is liable for the fair value of such lost or damaged baggage,' and an injunction requiring Delta to process each class member's baggage claim and 'to pay each class member compensation for his or her los[t] or damage[d]' baggage equal to the difference between the fair value of the baggage and the amount Delta paid. Though framed in terms of declaratory and injunctive relief, this class claim is for monetary damages. 'Almost invariably ... suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.' The injunction and declaration Richards seeks is no exception. No matter how she phrases it, what she wants is a judicial decree directing Delta to pay the class members the damages each is due. Yet the rule has long been that '[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money,'" quoting *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), and *Jaffee v. United States,* 592 F.2d 712, 715 (3d Cir.1979)). Similarly, granting Cholakyan's request for an injunction creating a reimbursement program would merely "initiate a process" through which individual class members could receive a monetary award; it would not grant classwide relief in

the form of an injunction.[118] Although Cholakyan attempts to characterize the requested relief differently, the court need not accept his characterization. See *Campion v. Old Republic Home Protection Co., Inc.,* 272 F.R.D. 517, 539–40 (S.D.Cal.2011) ("Plaintiff concedes he 'primarily seeks monetary restitution on behalf of the class.' Although he also seeks injunctive and declaratory relief, the nature of the relief sought is equivalent to a declaration of liability. The monetary relief sought would determine many of the key procedures used in trying this case because ... individualized procedures would be necessary to determine any appropriate restitution"); *Drimmer v. WD–40 Co.,* 2007 WL 2456003, at *5 ("Because class members who have already suffered damages from the 2000 Flushes products—including Drimmer himself—have nothing to gain from injunctive relief, the court concludes that this case is primarily for damages. Drimmer cannot make an end-run around Rule 23(b)(3) by tacking on a request for an injunction"); see also *Payne v. FujiFilm U.S.A., Inc.,* Civil Action No. 07–385(GEB), 2010 WL 2342388, *3 (D.N.J. May 28, 2010) ("Although Plaintiffs also ask for equitable and injunctive relief enjoining Defendant from pursuing policies and practices regarding the allegedly defective cameras, the record indicates that Plaintiffs' main goal is to obtain monetary damages, and the Court cannot conclude that the monetary damages are merely incidental to the class claim for injunctive relief").[119] Consequently, the proposed class is not appropriate for certification under Rule 23(b)(2).[120]

---

**118.** Cholakyan attempts to distinguish *Jamie S.* on its facts, but ignores the import of the case, which is that a plaintiff cannot request an injunction that ultimately orders defendant to make individualized damage determinations and payments to individual class members while claiming that he seeks classwide "injunctive relief" for purposes of Rule 23(b)(2). See *Jamie S.,* 668 F.3d at 499 ("[T]he remedial order requires class notice as a necessary element of its operation: Only those class members who respond are to be evaluated within the hybrid IEP system; nonresponders are unaffected. That the putative class members must opt in after notice and then be evaluated for membership in the class—before making a claim for entitlement to compensatory education—belies the notion that the court can

provide final injunctive relief to the class as a whole.").

**119.** Cholakyan's reply requests that the court "exercise its inherent authority" to exclude all former owners in order to create a class cognizable under Rule 23(b)(2). (Reply at 20.) Such an action would be futile, given that the court has identified three other Rule 23 requirements he has failed to meet.

**120.** If Cholakyan were found to lack standing, this would provide another reason for declining to certify a class under Rule 23(b)(2). See *Nelsen v. King County,* 895 F.2d 1248, 1249–50, 1254–55 (9th Cir.1990) (affirming the district court's denial of a motion for class certification under Rule 23(b)(2) because the named plaintiffs

## C. Questions Regarding the Adequacy of Cholakyan and His Counsel

Although the court need not reach the question of adequacy, the manner in which Cholakyan and his counsel have litigated this motion (indeed, the entire case) bears some comment. The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020; accord *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir.2003). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis,* 657 F.3d at 985.

Here, the court does not question that plaintiff's counsel are qualified to litigate this matter and that they have litigated it zealously.[121] They have litigated it so zealously, in fact, that the court is concerned they may have prioritized success in the litigation over the right of individual class members to pursue possibly valid claims. As noted, Cholakyan's earlier motion for class certification sought to certify a Rule 23(b)(3) class. The current motion seeks certification of a Rule 23(b)(2) class. Counsel do not explain this change, and it affects putative class members' rights.[122] First, unlike members of a class certified under Rule 23(b)(3), members of a Rule 23(b)(2) class do not have the right to receive notice or opt out. *Molski v. Gleich,* 318 F.3d 937, 947 (9th Cir.2003), overruled on other grounds in *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571 (9th Cir. 2010), rev'd, *Dukes,* 131 S.Ct. 2541. While a district court may exercise discretionary authority under Rule 23(d)(2) to require notice and the right to opt out, *id.,* granting Rule 23(b)(2) certification has the potential to bind all class members without notice that injunctive and declaratory relief has been sought on their behalf. Second, class counsel may have placed the class members' ability to seek compensatory damages and other monetary relief in jeopardy.

While Cholakyan and his attorneys may be satisfied with these trade-offs, the Supreme Court in *Dukes* has questioned the propriety of this type of tactical decision:

"In this case, for example, the named plaintiffs declined to include employees' claims for compensatory damages in their complaint. That strategy of including only backpay claims made it more likely that monetary relief would not 'predominate.' But it also created the possibility (if the predominance test were correct) that individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from. If it were determined, for example, that a particular class member is

---

"did not possess the requisite standing to assert a claim of injunctive relief"); see also *B.C. v. Plumas Unified School District,* 192 F.3d 1260, 1264 (9th Cir.1999) ("To have standing to seek injunctive relief, B.C. must demonstrate a real or immediate threat that defendants will again subject him to an illegal dog sniff of his person. B.C. cannot make this showing because he no longer is a student at Quincy High School or at any other school in the Plumas Unified School District; he has not been a student at Quincy since mid–1996; and he has no plans to return to school anywhere in the district.... A class of plaintiffs does not have standing to sue if the named plaintiff does not have standing" (citations omitted)); *Doe v. Unocal Corp.,* 67 F.Supp.2d 1140, 1142 (C.D.Cal.1999) ("[A] litigant who lacks standing to sue cannot obtain standing by attempting to certify a class").

**121.** Counsel in this case have clashed over everything from case management dates to discovery to class certification. This is one of the most heavily litigated cases on the court's docket.

**122.** Although the shift in strategy is not explained, the court's commonality analysis suggests that Cholakyan would have had significant difficulty meeting the more demanding predominance and superiority requirements of Rule 23(b)(3). Defendant, moreover, has moved to strike the complaint in the related *Lum* action, asserting that it is essentially duplicative of this action. Although the *Lum* plaintiffs have countered that the actions are different because of the scope of the classes they seek to certify and the fact that different plaintiffs are involved in *Lum,* the procedural posture of the two cases, and the fact that one of Cholakyan's lawyers is involved in both cases, suggests that counsel may have elected to have Cholakyan pursue certification of a Rule 23(b)(2) class in order to further distinguish this action from *Lum.*

not entitled to backpay because her denial of increased pay or a promotion was not the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide for themselves whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have." *Dukes,* 131 S.Ct. at 2559.

Like the plaintiffs in *Dukes,* Cholakyan seeks to avoid application of the Rule 23(b)(3) predominance and superiority tests by pursuing Rule 23(b)(2) certification. His decision, however, raises questions concerning individual class members' ability to recover damages. Cholakyan asserts that under *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), and *Hiser v. Franklin,* 94 F.3d 1287 (9th Cir.1996), the entry of judgment in this case will have no effect on class members' ability to pursue compensatory damages claims at a later time. The application of *Cooper* and *Hiser* to this case and to putative class members' hypothetical individual compensatory damages claims is not clear, however.

*Cooper* held that a judgment in a class action finding that an employer did not engage in a pattern or practice of racial discrimination did not preclude a plaintiff from later asserting an individual racial discrimination claim seeking compensatory damages against the employer. *Cooper,* 467 U.S. at 869, 104 S.Ct. 2794. The Court noted that "[i]t could not be more plain that the rejection of a claim of classwide discrimination does not warrant the conclusion that no member of the class could have a valid individual claim" because the theories of liability on which the respective claims were based were fundamentally different. *Id.* at 878, 104 S.Ct. 2794. It held that the judgment for the employer in the class action barred future suits alleging a pattern and practice of discrimination, but did not bar claims that individual employees suffered discrimination. *Id.* at 880, 104 S.Ct. 2794.

Cholakyan seeks a declaration that "[a]ll of Defendant's Model 211 vehicles ... possess a defectively designed Water Management System" and that "[a]s a result of the water leak defect, the Model 211 vehicles were not fit for the ordinary purposes for which they were sold...."[123] Given the nature of the declaration Cholakyan seeks, a judgment in defendant's favor on these issues might under *Cooper* bar an individual plaintiff from asserting a claim that he is entitled to damages because his or her vehicle's "water management system" was defectively designed. *Cooper,* 467 U.S. at 880, 104 S.Ct. 2794 (observing that judgment in the class action "[p]recludes the class members in any other litigation with the Bank from relitigating the question whether the Bank engaged in a pattern and practice of discrimination against black employees during the relevant time period"). If this were the case, while an individual class vehicle owner could litigate a claim that his or her particular vehicle was defectively *manufactured* or flawed for some non-design-related reason, he or she might not be able to litigate whether design defects in the water management system caused damage.

*Hiser* articulated "the general rule [ ]that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if based on the same events." 94 F.3d at 1291; see also *id.* at 1293 ("[R]es judicata must be applied carefully in the class action context"). There, the Ninth Circuit held that a prison inmate could assert a § 1983 claim based on the prison's refusal to photocopy legal documents for him, despite the entry of a consent decree in a state court class action addressing prisoner access to the courts. *Id.* at 1289. The court noted that Hiser's claims could not have been adjudicated in the prior action because they accrued two years after that action was settled. *Id.* It relied additionally on *Cooper,* observing that the Supreme Court there had "held that the plaintiffs' Title VII damages suit against their employer was not barred by the res judicata

---

**123.** Motion at 22.

effect of a previous Title VII class action—even though the plaintiffs had been class members and witnesses in the previous action and thus could have brought their damages claim in that case." *Id.* (citing *Cooper*). Hiser's case is factually different from this case in the sense that the plaintiff there was not a member of the class that obtained injunctive relief in the earlier action. Here, the question is whether the damages claims of actual class members will be precluded due to Cholakyan's decision to pursue injunctive and declaratory relief only. While it may be the "general rule" that class action suits seeking declaratory and injunctive relief do not bar subsequent damages suits by individual class members, in the present case a judgment in favor of defendant on Cholakyan's request for a declaration that "[a]ll of Defendant's Model 211 vehicles ... possess a defectively designed Water Management System" and that "[a]s a result of the water leak defect, the Model 211 vehicles were not fit for the ordinary purposes for which they were sold ..." might be used affirmatively by defendant to defeat a class member's effort to obtain compensatory damages for the very defect found here not to have existed.[124]

The Seventh Circuit's recent decision in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), does not definitively resolve this question. There, the court addressed a class of Title VII plaintiffs who originally sought certification under Rule 23 of both injunctive relief and monetary damages claims. At oral argument, class counsel stated that they wished to defer the issue of Rule 23(b)(3) certification, and sought certification under Rule 23(b)(2) only. *Id.* at 483–84. The Seventh Circuit's opinion was largely focused on whether it was appropriate to grant interlocutory review of the district court's certification decision under Rule 23(f). Near the end of the opinion, however, the Seventh Circuit opined on the ability of individual class members to seek monetary relief after the class proceedings concluded. The court stated that while "there may be no common issues" binding together the individual class members' requests for pecuniary relief, under claim preclusion rules a judgment *in favor* of the class would greatly simplify those subsequent damages actions. *Id.* at 492. While it speculated concerning the effect of a classwide judgment in favor of plaintiffs, the court did not address what impact a classwide judgment in favor of defendants might have. Applying the circuit court's analysis, however, it would seem that under normal preclusion rules, such a judgment would potentially pose serious barriers to future suits seeking monetary relief. This is the court's concern here,—i.e., whether individual claims for money damages be compromised if a mandatory Rule 23(b)(2) class is certified and plaintiffs lose on the merits.[125]

**124.** It is noteworthy that in *Hiser*, the plaintiff seeking to litigate an individual claim had not been a member of the earlier injunctive/declaratory relief class. Similarly, the cases on which the *Hiser* court relied for its statement of the broad proposition that a class action seeking declaratory and injunctive relief does not bar subsequent individual damages actions by class members all involved pending class actions seeking declaratory or injunctive relief. In none had there been an adverse finding on the factual or legal question that underlay the individual damages suit. See, e.g., *Fortner v. Thomas*, 983 F.2d 1024, 1030–32 (11th Cir.1993); *In re Jackson Lockdown/MCO Cases*, 568 F.Supp. 869, 892 (E.D.Mich.1983).

**125.** Rule 23(c)(2)(A) gives the district court discretion to "direct appropriate notice to the class" for any class certified under Rule 23(b)(1) or (b)(2). FED.R.CIV.PROC. 23(c)(2)(A). While some of the court's concerns may be ameliorated if the court permitted class members to opt out, class counsel did not explicitly request a notice and opt-out procedure in their motion or in their proposed order. Moreover, the notion that class members' rights are best protected by notice and an opt-out procedure itself suggests that this case is better litigated as a Rule 23(b)(3) class action—the path Cholakyan and his counsel originally chose. Cf. *Dukes*, 131 S.Ct. at 2558 ("Given that structure, we think it clear that individualized monetary claims belong in Rule 23(b)(3). The procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary to a (b)(2) class"); *Molski*, 318 F.3d at 952 ("[T]he District Court abused its discretion by certifying a non-opt-out class because substantial damages were released. Because the class members had the right to opt-out, they also had the right to the best notice practicable ...").

Consequently, under the specific circumstances of this case, the court concludes the state of the law on this subject is at best unsettled. While defendant would have the court read *Dukes* broadly, as another court recognized, there "the Supreme Court focused on the problems that would arise if individualized relief were allowed in a(b)(2) class. This focus confirms what common sense suggests: a Rule 23(b)(2) judgment, with its one-size-fits-all approach and its limited procedural protections, will not preclude later claims for individualized relief." *In re TFT–LCD (Flat Panel) Antitrust Litig.*, No. M 07–1827 SI, 2012 WL 273883, *2 (N.D.Cal. Jan. 30, 2012). Here, Cholakyan seeks injunctive and declaratory relief on behalf of a Rule 23(b)(2) class; by doing so, he has, at a minimum, placed class members' ability to pursue individualized claims for monetary relief in question. While *Cooper* indicates that under some circumstances individual damages claims remain available to class members even after an adverse judgment in a Rule 23(b)(2) class action, the Court clearly stated that a plaintiff could not relitigate the exact question that was adjudicated in the prior litigation.[126] See *id.* ("[C]laims for monetary damages typically rely upon different facts than claims for injunctive relief," citing *Cooper*, 467 U.S. at 876, 104 S.Ct. 2794); *Fosmire*, 277 F.R.D. at 634 ("As a result of Ms. Fosmire's claim splitting, class members from other states who have both diminished value claims arising from residual property damage, as well as stigma damages, cannot bring their stigma damages claims in this lawsuit. Progressive asserts that these class members risk being prevented by the doctrines of claim or issue preclusion from ever pursuing stigma damages in another lawsuit. The court agrees, and concludes that Ms. Fosmire's attempt to split her putative class members' claim by excluding stigma damages creates a conflict between her interests and the interests of the putative class, rendering her an inadequate class representative"). This is the situation threatened in this case.

Preclusion issues of this kind are complex, and should be definitively decided only on full briefing. The fact, however, that Cholakyan and his attorneys are willing potentially to sacrifice individual class members' right to pursue the recovery of monetary damages without fully exploring the implications of their actions raises concerns about their adequacy. While the court stops short of a finding that Cholakyan and counsel are inadequate—as there are other grounds that are more than sufficient to support the denial of class certification—the court is compelled to raise the issue in this order.

### III. CONCLUSION

For the reasons stated, the court denies plaintiff's motion for class certification in its entirety.

---

**126.** It is noteworthy that Cholakyan has not forgone his compensatory damages claim. The second amended complaint seeks an award of compensatory, statutory and punitive damages, and there is no indication that Cholakyan intends to forego pursuing such relief. (Second Amended Complaint at 40 (seeking "an award ... of compensatory, statutory, and punitive damages ..." as well as "an award ... of all incidental and consequential damages ... which have resulted from Defendant's breach of its implied warranties ...").) Indeed, at a deposition in June 2011, Cholakyan agreed that he sought "out of pocket expenses" and the repurchase of his vehicle. (Yoshino Decl., Exh. 5 ("Cholakyan Depo.") at 351–52.)